**OLSONITE CORPORATION, Plaintiff,**

v.

**BEMIS MANUFACTURING COMPANY, Defendant.**

No. 83–C–966.

United States District Court, E.D. Wisconsin.

June 12, 1985.

William H. Francis, Detroit, Mich., for plaintiff.

Gerson E. Meyers, Chicago, Ill., for defendant.

## DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

The plaintiff, Olsonite Corporation, brought this action charging the defendant, Bemis Manufacturing Company, with patent infringement, with false descriptions and representations in violation of section 43 of the Lanham Act, 15 U.S.C. § 1125(a), and with common law false advertising and unfair competition. The defendant has counterclaimed for a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the Olsonite patent in suit is invalid and not infringed. Jurisdiction is based on 28 U.S.C. §§ 1331, 1332, and 1338. The parties' claims have been tried to the court. This decision shall constitute my findings of fact and conclusions of law in accordance with Rule 52(a), Federal Rules of Civil Procedure.

## BACKGROUND

· This case involves toilet seat hinge posts and their components. A toilet seat includes a seat portion or ring adapted to sit on a toilet bowl, and usually a cover which rests on the ring. The ring and cover are hinged together and attached to a bowl by associated hinge posts which allow the cover and the ring to be raised and lowered. The seat is attached to a bowl by passing a pair of threaded fastener portions, components of the hinge posts known as bolts or studs, through a pair of stud, or mounting, holes formed in the toilet bowl and located at the back of the bowl. The diameter and depth of toilet seat stud holes varies from one manufacturer to another, from one bowl model to another of the same manufacturer, and even from one bowl to another of the same model of the same manufacturer. Toilet seats and their hinge posts are not designed for any specific model or manufacturer of toilet bowls and are primarily sold as replacements for worn out, broken, or outdated seats on bowls installed many years ago. Hinge posts therefore are designed to secure seats firmly to bowls having stud holes which vary in diameter and depth.

In the prior art, in order to attach a toilet seat to a toilet bowl, a nut was threaded onto the bottom end of each bolt from below the bowl after the bolts had been inserted in the stud holes. It was thus necessary to turn the nut, both to tighten it against the bottom of the bowl and later to loosen it if the seat was to be removed. Some sort of hand tool such as a wrench or a pliers was generally required to do this. Because the area below the stud hole is often cramped and inaccessible, it was difficult to use the needed tools.

Olsonite and Bemis are two of the largest manufacturers of toilet seats in the industry. Olsonite has all right, title to, and interest in U.S. Patent No. 3,570,021 (Watson patent), the patent in suit. The Watson patent issued in the name of Robert E. Watson on March 16, 1971, and is based on an application filed in the U.S. Patent and Trademark Office (PTO) on March 20, 1969.

Since 1969, Olsonite has manufactured and sold toilet seats each having a pair of hinges of the type disclosed in the Watson patent. Since 1981, Bemis has manufactured and sold toilet seats which include a hinge post assembly identified as the DIAL–ON hinge. It is the dial-on hinge which Olsonite asserts infringes the Watson patent, and it is the advertisements for this Bemis product which provide the basis for Olsonite's unfair competition claims.

## THE WATSON PATENT

The Watson patent, entitled "Top-Installable Toilet Seat Hinge Post," describes one particular type of expansion fastener embodied in a top-installable toilet seat hinge post. The particular top-installable toilet seat hinge post disclosed and claimed includes a standard hinge post assembly at its upper end for hingedly supporting a toilet seat and cover. This portion is described in the patent as a bracket body having a base and a pintle support extending up from the bracket body. The top installable hinge post assembly also includes and requires a hollow stem having a "multiplicity" of slots; a threaded fastener (a bolt or stud); and a nut, "polygonal in cross-section," threaded on the bolt and located or disposed in a counterbore, "polygonal in cross-section," formed in the hollow stem.

The Watson bracket body, the slotted stem, the bolt, and the nut are designed to be preassembled. A pair of such pre-assembled units are inserted in the stud holes of a toilet bowl. Thus, the Watson hinge post can be inserted in a stud hole from above the bowl and secured without any manipulation in the limited and often inaccessible space beneath the bowl platform.

The Watson device can be secured in stud holes which vary in diameter and thickness as occur in the plumbing industry. The hinge post is secured by a stem received in the mounting hole which has a plurality of circumferentially spaced fingers which are expanded or moved radially outward by a nut received and moved upward between the fingers by turning a bolt which extends through the stem from above. To prevent the nut from rotating when the bolt is turned, the stem has a polygonal cross-section with six tapered flat sides which bear on edges of the corresponding six sides of the nut.

## THE BEMIS DIAL–ON HINGE POST

In 1981, Bemis began selling the accused dial-on hinge post. The Bemis product is an all plastic device which is generally described in U.S. Patent No. 4,319,365, owned by Bemis. It is not, however, the theoretical device described in the Bemis patent which is the subject of the plaintiff's infringement claim, but the components of the commercial dial-on hinge post which are at issue.

There are three pieces of the Bemis devices: the hinge post and cap, the bolt, and the nut. The upper end of the hinge post has a standard configuration for hinged connection to the toilet seat. The hinge post also includes a thin-walled cylindrical sleeve formed with two slots which is slightly flared downward. The two parts of the sleeve, or fingers, are forced outward as the nut is drawn up into the stem. The cylindrical wall of the sleeve is thin to accommodate the relatively thick diameter of the plastic, hand-operable bolt which is passed through the sleeve from above when the seat and hinge posts have been positioned on the toilet bowl.

After the seat is positioned on the bowl and the bolts are inserted, a nut is threaded onto each bolt from below the bowl. The nut is turned from below the bowl until snug. The bolt is then turned, either by hand or with a screwdriver, from above the bowl to draw up the nut and tighten the hinge assembly.

The Bemis dial-on nut has a diameter at its widest point of $7/10''$. This diameter is larger than the standard range of diameters for toilet bowl stud holes, $1/2''$ to $5/8''$.

In the normal situation, therefore, the dial-on hinge post cannot be preassembled and dropped through the stud hole on a toilet bowl from the top, as can the hinge post described in the Watson patent. For toilet bowl stud holes larger than $7/10''$ in diameter, however, the entire dial-on hinge post could be preassembled and inserted in the stud holes from above the bowl. There is no evidence, however, that the dial-on hinge post could be securely fastened in such holes.

The dial-on nut includes tabs or keys which fit into the slots formed in the thin-walled sleeve. These keys engage the

sides of the slots transverse to the axis of the sleeve to prevent the nut from turning as the bolt is tightened. The dial-on post is designed to be installed without the need for tools, either in the space below the platform of the bowl or from above the stud holes.

## WATSON PATENT VALIDITY

■ Bemis contends that the Watson patent is invalid for obviousness under 35 U.S.C. § 103. Specifically, Bemis asserts that the Watson patent was obvious in light of prior art patents: Wilham patent No. 3,449,774 (Wilham patent), Baker British patent No. 906,615 (British patent), and Fisher Canadian patent No. 758,349 (Canadian patent). In ruling on a claim of obviousness, the court must determine (1) the scope and content of the prior art; (2) the differences between the patent in suit and the prior art, and (3) the level of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

A patent is presumed valid. 35 U.S.C. § 282. The party attacking the validity of the patent carries the burden of establishing invalidity. *National Business Systems, Inc. v. AM Int'l, Inc.*, 743 F.2d 1227, 1231 (7th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985).

## I. The Scope and Content of the Prior Art

### A. The Wilham Patent

The prior art Wilham patent discloses a hinge post having a body, spacer, and rubber sleeve. The rubber sleeve is expanded to secure the post to a bowl by rotating a bolt which extends through the body, spacer, and sleeve and engages a nut in the bottom of the sleeve.

The Wilham hinge post is installed by placing its body over the stud hole from above the platform and then inserting the bolt from above through a hole in the body. The spacer and rubber sleeve are then inserted from below the platform into the stud hole. The bolt is then rotated, such as by a screwdriver from above the bowl while the rubber sleeve and its nut are manually held from below the bowl to expand the sleeve into engagement with the hole. Technical experts for both the plaintiff and the defendant testified that this is the only manner of installation of this hinge post disclosed by the Wilham patent.

The Wilham patent states that use of the spacer is critical. If the spacer is eliminated, the sleeve expands along the path of least resistance which causes it to extrude or pop out of the top of the stud hole and thereby disconnect the hinge post and seat from the bowl. Wilham patent, col. 3, lines 3–17.

### B. The British Patent

The British patent discloses an expansion socket for bolting machinery to a concrete bed. The sidewall of the socket can be continuous or split by slits to form fingers. The socket is expanded by the cooperation of a bolt with a nut received in a recess, or counterbore, between the fingers adjacent to one end of the socket. The socket is expanded in two discrete steps, rather than continuously, as the nut passes each of two axially spaced shoulders in the recess. The nut is permanently captured in the recess which prevents it from rotating with respect to the socket.

When the bolt is turned, the socket is prevented from rotating either by being forced into a tight fitting blind hold in the concrete bed so that pointed barbs on the socket engage the sidewall of the hole or the socket is grouted in place in the blind hole. If the blind hole is larger in diameter than the socket, when the bolt is turned, the socket will rotate with the bolt, and hence will not be expanded. The socket is intended to be permanently installed in the hole, cannot be removed and reinstalled several times, and is intended primarily for heavy loads and large holes of several inches in diameter.

### C. The Canadian Patent

The Canadian Patent discloses a device for hanging pictures on walls. The device

has a sleeve with slots forming fingers which are expanded by the cooperation of a bolt threaded into a conical nut received in a conical recess in the lower end of the sleeve between the fingers. When the bolt is turned, rotation of the sleeve is prevented by tongues and projections on the sleeve which engage the sidewall of a tightly fitting blind hole into which the sleeve is forced. A blind hole has an inaccessible bottom. Thus, an expansion device for such a hole must be completely installable from above the hole. If the hole is larger than the sleeve, when the bolt is turned, the sleeve will rotate with the bolt and, hence, the sleeve will not be expanded. The sleeve is intended to be permanently installed in a blind hole and cannot be removed and reinstalled several times.

The drawings and text of the Canadian patent disclose complementary conical portions of the nut and recess which do not positively stop or prevent rotation of the nut relative to the sleeve. The text of the patent does not state or say that rotation of the nut is positively prevented and the drawings do not show a structure or configuration which would positively prevent rotation of the nut. Experts for both parties testified that the drawings and text do not disclose a structure which would positively prevent rotation of the nut and that even if they did, after the sleeve initially begins to expand, it would no longer positively prevent rotation of the nut. These experts also observed that even if such a structure was disclosed, it would not positively prevent rotation of the nut after the sleeve initially begins to expand and, hence, the sleeve could not be further expanded.

## II. Differences Between the Prior Art and the Watson Patent

Like prior art toilet seat hinge posts, the hinge post claimed by the Watson patent supports and interconnects the components of the seat, the ring, and the cover. Further, expansion bolt fasteners certainly were not unknown prior to the Watson patent. The Wilham, Canadian, and British Patents all describe types of expansion fas-

teners. Moreover, the Canadian and British patents describe devices that, like the Watson hinge post, can be preassembled and inserted as a complete unit in a blind hole. The Canadian and British patents also disclose stems similar to the Watson stem in that each has multiple elongated circumferentially spaced slots extending from the exterior to the bore. Finally, the British device, like the Watson device, includes a threaded nut of polygonal cross-section fixedly disposed in a counterbore of polygonal cross-section to prevent rotation. There are, however, significant differences between the Watson patent and the prior art.

In the claimed Watson hinge post, the body and stem are inserted from above the bowl and, when the bolt is turned from above the bowl, rotation of the nut is prevented without reaching under the platform in the cramped and inaccessible space to grab and hold the nut or stem to prevent rotation. In contrast, when the Wilham hinge post is installed, a spacer and rubber sleeve are inserted from below by reaching into the inaccessible space and are held from below in this space, either by hand or with a tool, such as a pliers, to prevent rotation of the sleeve while the bolt is turned to secure the post to the bowl.

The claimed Watson hinge post is secured in the stud hole by flaring its fingers generally radially outward below the platform and into firm engagement with the lower edge of the stud hole. This flared finger structure avoids the problems of the Wilham hinge post. It eliminates wobbling, the need for a spacer, the effects of water and glaze in the hole which cause the rubber sleeve to pop out, and the tendency when in use for side thrusts or forces to work the device loose and pop it out of the stud hole.

Furthermore, for a given diameter and length of the stem, the claimed Watson split finger construction can be secured in a much wider range of diameters and lengths of stud holes than can a Wilham hinge post with a rubber sleeve of the same diameter and length of the sleeve and spacer. The

claimed Watson split finger construction can cover essentially the entire range of diameters and lengths of stud holes normally found in toilet bowls produced by all manufacturers. With the Wilham post it would be necessary to use rubber sleeves of different diameters and spacers of different lengths to cover this same range of stud holes.

The British and Canadian patents do not disclose toilet seat hinge posts but, respectively, an expandable socket for securing a machine to concrete beds and a hook for fastening picture frames to a wall. These patents neither disclose nor suggest the basic approach of the claimed Watson hinge post of a body having a stem with split fingers which is inserted from above the bowl into the stud hole. By turning a bolt from above the bowl, the fingers are forced radially outward so that they flare out below the hole to lock the hinge post to the bowl without having to reach into the inaccessible and cramped space below the hole and grasp the stem and/or the nut with a tool, such as a pliers, to prevent rotation of the nut for tightening the bolt. These patents do not disclose which of their elements should be discarded and which elements selected, modified, and rearranged with various elements of the Wilham hinge post to produce the claimed Watson device.

Unlike the claimed Watson hinge post, the fingers of the sleeves of the British and Canadian devices do not flare out below the lower end of their stud holes. Hence they do not provide the secure and rigid mounting of the claimed Watson hinge post and would not solve the problems of the Wilham hinge post of wobbling or working loose in use due to side thrusts or forces, and tending to pop out of the holes due to glaze and water providing low friction or slippery surfaces.

Unlike the claimed Watson hinge post, the devices claimed in the British and Canadian patents must fit tightly into or firmly engage the sidewall of a stud hole before the bolt is turned to expand and secure them in the hole. If they do not, their sleeves would rotate with their bolts when they are turned and, as a result, would not expand and become secured in the stud holes. Thus, for a given sleeve diameter, these devices cannot be used in stud holes having the variations in diameter of the stud holes in toilet bowls. These devices are also intended to be permanently installed in blind stud holes and, unlike the claimed Watson hinge post, cannot be removed and installed several times.

Unlike Watson, in the Canadian device there is no structure positively preventing rotation of the nut relative to the sleeve, and hence when the sleeve is disposed in a stud hole, there is no assurance the sleeve will be expanded even if it is held when the bolt is rotated. In the British device, unlike Watson, the fingers are moved radially outward in discrete steps or increments which would be unworkable in a toilet bowl and likely to break the fragile china of the bowl.

### III. Level of Ordinary Skill in the Art

A person of ordinary skill in the art of securing toilet seats to bowls would have a formal education and training or its equivalent in the principles and theories of mechanical engineering and product design, including knowledge of the strength and other characteristics of steel, plastic, rubber, and vitreous china materials. A skilled person would also have substantial practical experience in the development, design testing, and methods of manufacturing hinge posts for securing toilet seats to bowls. A skilled person would know that the diameter and depth of stud holes in bowls varies significantly from one manufacturer to another, one model to another of the same manufacturer, and even from one bowl to another of the same model of a manufacturer. A skilled person, therefore, would appreciate that hinge posts should be designed to accommodate the variations in hole diameters and depths since the posts are used primarily in the replacement market and are not designed for any particular model or make of bowl.

A skilled person would know hinge posts are designed to enable toilet seats to be removed, reinstalled, and replaced on bowls without damage or injury to either the hinge post or the bowl. He would also know that since bowls are made of china, they are relatively fragile and can be easily cracked or broken by a sharp blow, such as from a hand tool which slips from a nut when it is being tightened, or by the relatively modest force produced when a hinge post is secured in a stud hole.

A skilled person would know that the area immediately below the stud hole in the bowl is generally quite cramped and inaccessible, which makes it difficult to manipulate and rotate tools, such as a wrench, pliers or screwdriver, in the space below the bowl platform when securing a hinge post to the bowl.

A skilled person would know that it is difficult to adequately secure a hinge post in a stud hole since frequently the upper end of the hole is flared due to the way the bowl is made, and frequently during manufacture of the bowl some of the glaze runs or drips into the stud hole which results in the glazed portion being very slippery or having a low coefficient of friction.

A skilled person would know that when a hinge post is used on a bowl, the stud holes frequently become wet which decreases the coefficient of friction and makes plastic and rubber parts received in the hole slippery so they can easily slip out or work out of the hole. A skilled person would know that when a person sits on a toilet seat, the hinge posts are subjected to substantial side thrusts or forces which have a decided tendency to loosen the hinge posts so that they wobble or work out of the holes even if initially they were securely installed. Hence, a skilled person would know and appreciate that hinge posts must be designed so that they will not wobble or work loose in use and, if they do become loose, they can be easily tightened or resecured to the bowl. A person of ordinary skill also would be familiar with different types of expansion fasteners such as those de-

scribed in the Wilham, British, and Canadian patents.

IV. Secondary Considerations

■ Secondary considerations such as commercial success, long felt but unsolved needs, and the failure of others may also be considered in evaluating a claim of obviousness. *Graham, supra,* 383 U.S. at 17–18, 86 S.Ct. at 693–694.

A. Commercial Success

The level of commercial success of the Watson hinge post weighs neither strongly for nor against a finding of obviousness. The Watson hinge post certainly has not been a tremendous commercial success for Olsonite. Sales of the device comprise less than one percent of Olsonite's overall sales. At the same time, toilet seats with the Watson hinge have been sold at a premium price of $.50 per seat, or approximately ten percent per seat, without any advertising or special promotion of the Watson hinge post.

Olsonite, however, failed to introduce any evidence clearly showing that sales of the Watson hinge post are or have been based on any of the features in the Watson patent. Commercial success supports a finding of nonobviousness only when the success is attributable to the feature which is the subject of the patent claim. *Marconi Wireless Tel. Co. v. United States,* 320 U.S. 1, 35 n. 20, 63 S.Ct. 1393, 1409 n. 20, 87 L.Ed. 1731 (1943).

Olsonite also claims commercial success based on the large sales by Bemis of its accused dial-on hinge post. In the absence of infringement, however, the Bemis sales are not germane in measuring the commercial success of the Watson hinge. (*See* discussion of infringement *infra* ).

B. Long Felt Need and the Failure of Others

As evidenced by Bloom U.S. Patent No. 1,038,834 and other prior art patents, for more than fifty years prior to the creation of the Watson hinge post significant problems have been experienced in the art of

securing toilet seats to bowls. These problems included substantial variations in the diameter and thickness of the stud hole, wobbling and working loose of the hinge post, and a cramped and inaccessible area beneath the stud hole making it difficult to utilize tools to hold and turn nuts or other parts of the hinge post to secure it to the bowl. As evidenced by the prior art Payne U.S. Patent No. 1,031,462, various forms of expansion bolt devices with expandable fingers for use in blind holes were known to skilled persons since at least 1911. The devices disclosed in the British and Canadian patents are examples of such expansion fasteners.

About the time the patented Watson hinge post was created, several other skilled persons were actively trying to develop hinge post constructions which would solve these long-standing problems. These activities and contemporaneous developments by others are evidenced by the prior art Newcomer U.S. Patent No. 3,301,121, Wodegun U.S. Patent No. 3,377,633, and Wilham U.S. Patent No. 3,449,774. These contemporaneous developments neither produced nor suggested the claimed Watson hinge post construction and arrangement or its solution to the various long-standing problems in the art. The evidence of long felt need and the failure of others fully to solve the need supports a finding that the hinge post described in the Watson patent was not obvious to a person of ordinary skill at the time it was issued.

V.   Conclusion of Nonobviousness

There is no dispute but that expansion fasteners had been used on toilet seat hinge post assemblies prior to the Watson patent and that the Wilham, British, and Canadian patents represent different types of expansion devices. Although the Wilham patent does not disclose a top-installable hinge post, both the British and Canadian patents disclose expansion fasteners that, like the Watson device, are top-installable in that they can be completely preassembled and inserted from above the mounting hole. Moreover, the British and Canadian patents disclose devices with multifingered stems, like the stem of the Watson device. Further, the British patent, like the Watson hinge post, discloses a device in which the counterbore and nut are of corresponding polygonal cross-section, having flat sides to engage one another to prevent rotation of the nut when the bolt is turned.

While, considered together, the prior art patents disclose several of the elements set forth in the Watson patent, the prior art does not reveal a method for top-installing a hinge post so that it remains securely in the mounting hole *and* so that it can easily be removed and reinserted or replaced. The device disclosed in the Wilham patent is not top-installable. The British and Canadian devices are fixed permanently in their mounting holes and cannot be removed conveniently. In addition, the prior art does not disclose Watson's approach of inserting a multi-fingered stem into a mounting hole and moving the fingers radially outward so they flare out below the bowl, engaging the lower edge of the hole and securely holding the hinge post on the bowl.

■ Accordingly, I conclude that the defendant, Bemis, has failed to meet its burden of showing that the device disclosed by the Watson patent, taken as a whole, was obvious to a person of ordinary skill in the art at the time the invention was made. In reaching this conclusion, I recognize that "multiple references may be combined to show the obviousness of a claimed invention." *Lear-Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 889 (Fed.Cir.1984). I am mindful, however, that care must be taken to avoid hindsight in evaluating a claim of obviousness. *L.E. Sauer Machine Co., Inc. v. Corrugated Finishing Products, Inc.,* 642 F.2d 203, 206 (7th Cir.1981). Every invention is in a sense a combination of old elements. The "invention" lies in the unique selection of old elements which is not obvious to one skilled in the art. *See B.G. Corp. v. Walter Kidde & Co.,* 79 F.2d 20, 21–22 (2d Cir.1935) (Hand, J.).

The Watson device may not represent an astounding breakthrough or a new technology. It is, however, a nonobvious improvement on the prior art. There is nothing in the Wilham, British, and Canadian patents, considered individually or in combination, to disclose or suggest which of their elements should be discarded and which selected, modified, and rearranged to produce the hinge post disclosed in the Watson patent.

Furthermore, the statutory presumption of patent validity is reinforced where the PTO cited and considered the relevant art before issuing the patent. *See Chicago Rawhide Mfg. Co. v. Crane Packing Co.*, 523 F.2d 452, 457–58 (7th Cir.1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976). The statutory presumption of validity derives from the court's deference, as a rule, to the PTO's technical expertise in originally issuing the patent. *National Business Systems, supra*, 743 F.2d at 1232. The Watson file wrapper discloses that the PTO cited the Wilham, British, and Canadian patents when issuing the Watson patent. The PTO expressly discussed the British and Canadian patents but not the Wilham patent. Nonetheless, it is reasonable to assume that the PTO considered all prior art cited, including the Wilham patent. *See E.I. duPont de Nemours & Co. v. Berkley & Co., Inc.*, 620 F.2d 1247, 1267 (8th Cir.1980); *Panduit Corp. v. Burndy Corp.*, 517 F.2d 535, 538 n. 1 (7th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

In sum, I find that the defendant has failed to meet its burden of establishing that the device disclosed in the Watson patent was obvious at the time of its invention. The defendant, therefore, has failed to establish invalidity under 35 U.S.C. § 103.

## INFRINGEMENT

■ The plaintiff contends that the Bemis dial-on hinge post infringes both claims one and two of the Watson patent. Claims one and two disclose:

"1. A top-installable toilet seat hinge post adapted for installation in a stud hole in the rear platform of a conventional toilet bowl, said hinge comprising

"a hinge post bracket having a bracket body including a base portion with a hinge pintle support extending upward therefrom and an elongated stem portion extending downward therefrom and configured to approximately fit the platform stud hole,

"said stem portion having a longitudinal bore therethrough and a downwardly-flared counterbore of polygonal cross-section disposed in the lower end portion of said stem portion in communication with said bore,

"said stem portion having a multiplicity of elongated circumferentially-spaced slots therein extending therethrough from the exterior thereof to said bore and defining a multiplicity of circumferenially-spaced fingers disposed between said slots,

"a screw-threaded fastener rotatably mounted in said bore with a rotating-tool receiving head at the upper end thereof, and

"a threaded nut of polygonal cross-section fixedly disposed in said flared counterbore in relative rotation-preventing relationship therewith and threadedly engaging said fastener.

"2. A top-installable toilet seat hinge post, according to claim 1, wherein said nut and said flared counterbore are of corresponding polygonal cross-section and have substantially flat sides engaging one another in said relative rotation-preventing relationship."

The plaintiff asserts that these claims are infringed because they read on and cover the defendant's dial-on hinge post and also under the doctrine of equivalents. The burden remains on the plaintiff throughout the case to prove infringement. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 n. 4 (Fed.Cir.1983)

## I. Literal Infringement

■ In order to determine whether an accused device infringes a patent, "resort

must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out...." *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). Thus, the court must initially determine if the accused Bemis device falls within, or literally infringes, the Watson patent.

## A. Top-Installable Hinge Post

The plaintiff first contends that the Bemis dial-on hinge post is "top-installable" within the meaning of the Watson patent. The plaintiff asserts that the patent defines top-installable to mean a hinge post which can be secured to a bowl from above without insertion and manipulation of a tool in the space below the platform of the bowl.

The defendant, on the other hand, claims that top-installable, as it is used in the Watson patent, means that the entire hinge post assembly, including the nut, is preassembled and dropped into the stud hole of a bowl as a unit so that tightening may proceed without having to tighten the nut from below the platform of the bowl.

The plaintiff claims that top-installable is expressly defined in the Watson patent at column 2, lines 18–25, which provides:

"The present hinge post ... not only adapts itself to such variations in manufacture but is top-installable, i.e. from above the platform ..., and therefore does not require access to the limited and often inaccessible space below the platform ... for the insertion and manipulation of a wrench, pliers or other tools used in installing or removing the hinge post...."

The plaintiff also claims that its asserted definition of top-installable is consistent with statements in the Watson patent describing the hinge post. The hinge post is characterized, at column 2, lines 5–22, as consisting of a bracket, an expansion bolt, and a closure cap, all installed in the stud hole. This portion of the patent does not include any mention of the nut or any requirement that the nut pass through the stud hole.

It is certainly true that a patentee may be his own lexicographer. *Feed Service Corp. v. Kent Feeds, Inc.,* 528 F.2d 756 (7th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). It does not follow, however, that the passages from the Watson patent relied on by the plaintiff clearly establish that top-installable means installable without the use of any tools in the space below the platform of the bowl.

Patent claims, like contractual clauses, must be construed with reference to the other parts of the patent instrument, including the drawings, as well as the circumstances surrounding the inception of the patent. *See Graham supra,* 383 U.S. at 33, 86 S.Ct. at 701; *Autogiro Co. of America v. United States,* 384 F.2d 391, 397, 181 Ct.Cl. 55 (1967). Analyzing the Watson patent with these factors in mind, I conclude that top-installable as it is used in the Watson patent means that the entire hinge post, including the nut, is preassembled and inserted in the stud hole from above the bowl.

The Watson patent, in its preamble, states that the hinge post includes, *inter alia,* a nut threaded on a screw or bolt. Col. 1, lines 19–21. The preamble goes on to state, at column 1, lines 24–20, that:

"The *hinge post* is installed by dropping the stem into the stud hole after which the screw of the bolt is tightened, causing the nut thereon to travel upward into the tapered counterbore and expand the circumferentially-spaced fingers formed by the longitudinal slots of the stem into tight gripping engagement with the side wall of the stud hole." (Emphasis added).

It is the entire hinge post, including the nut, which is preassembled and dropped into the stud hole, or top-installed.

The court is cognizant of the holding in *Marston v. J.C. Penney Co.,* 353 F.2d 976, 986 (4th Cir.1965), *cert. denied,* 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966), that:

"If the preamble merely states a purpose or intended use and the remainder

of the claim completely defines the invention independent of the preamble, it is not a limitation on the claims."

This is not a case, however, where the preamble only states a purpose or intended use for the invention. Instead, the relevant passage of the preamble describes the structure of the Watson hinge post. As such, it is not a "limitation" on the claims but provides relevant information for the court in determining the meaning of top-installable as it is used in the Watson patent. *See Jamesbury Corp. v. Litton Industrial Products, Inc.*, 586 F.2d 917 (2d Cir.1978), *cert. denied*, 440 U.S. 961, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979); *Wells Mfg. Corp. v. Littlefuse, Inc.*, 547 F.2d 346 (7th Cir.1976).

Moreover, in describing the invention, the patent states that the hinge post, as it is described in the preamble (including the nut), "enables its insertion and removal from above...." Col. 1, line 39. In addition, figures 1 and 7 of the patent each show an entire hinge post assembly with a nut. These figures are described in the Watson patent, at column 1, lines 52–54, 66–67, as follows:

"FIG. 1 [with a nut] is a central vertical section *through a top-installable toilet seat hinge post*, according to one form of the invention, taken along the line 1–1 in FIG. 2; ...

"FIG. 7 [with a nut] is a central vertical section through a modified *top-installable toilet seat hinge post*...." (Emphasis added).

Thus, contrary to the plaintiff's contention, the Watson patent specifically includes the nut as part of the top-installable hinge post. It is the entire hinge post which is top-installable, according to the patent.

The fact that the patent does not state the meaning of top-installable in clearer terms does not preclude the court's interpretation of the term. This is particularly true in the case of an invention where "[a] verbal portrayal is usually an afterthought written to satisfy the requirements of patent law." *Autogiro Co., supra*, 384 F.2d at 397.

To the extent that the meaning of top-installable is ambiguous with reference to the patent as a whole, the term should be given its ordinary and accustomed meaning. *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 137 F.2d 3, 6 (7th Cir.1943), *aff'd*, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944). The ordinary, common sense meaning of top-installable refers not to the fact that no tools need be used to tighten the nut from beneath the bowl but that the entire hinge post assembly may be installed from above the stud hole in the bowl.

The file wrapper, or file history in the PTO, is also consistent with the court's interpretation of top-installable. Reference to the file wrapper is relevant in construing a patent claim. *Graham, supra*, 383 U.S. at 33, 86 S.Ct. at 701. The plaintiff, in its argument to the PTO, stated that the "top-installable toilet seat hinge post is diametrically opposed to that of [the prior art] which cannot be inserted as unitary assemblies from the top without disassembling them...." Amendment to Watson patent, July 31, 1970, p. 4. This statement indicates that the plaintiff used the term top-installable to mean that the entire hinge post could be preassembled and inserted through the stud hole from the top.

The principle of file wrapper estoppel·is also applicable to the patentee's statement in the PTO concerning the top-installability of his hinge post. The Court of Appeals for the Federal Circuit has recognized that file wrapper estoppel applies not only to claim amendments submitted to overcome rejections based on prior art but also to arguments submitted to obtain the patent. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983). Having argued a narrow construction for his claims before the PTO, a patentee should not be permitted to argue a broader construction in support of an infringement claim. *Coleco Industries, Inc. v. United States Int'l Trade Commission*, 573 F.2d 1247, 1257 (C.C.P.A.1978). The plaintiff, therefore, is bound by the patentee's statement in the PTO distinguishing his inven-

tion from the prior art in part because it is top-installable in the sense that it can be fully preassembled and inserted in the stud hole from above.

The plaintiff has failed to prove that the accused Bemis hinge post is top-installable as that term is used in the Watson patent. The plaintiff mistakenly appears to assume in its argument that the defendant carried the burden of showing that the accused device was *not* top-installable.

During the trial, Mr. Watson, Olsonite's principal witness and its patentee, was asked to install the accused components of a Bemis dial-on toilet seat on a toilet bowl. Mr. Watson could not install the preassembled components because they would not go through the stud holes formed in the bowl. Mr. Watson testified that the Bemis assembly was not top-installable as he defined that term. R. 192. The defendant's president and its director of engineering systems similarly testified at trial. R. 104, 357–60.

■ The evidence offered clearly established that the dial-on nut, as manufactured, is 7/10″ in diameter. This evidence is in no way refuted by the Bemis patent, no. 4,319.365, and Bemis memos and drawings of the proposed device made prior to its actual production which show a nut with a diameter of 1/2″. It is the product *as manufactured* against which the infringement claim must be measured. The 7/10″ diameter of the dial-on nut is larger than the industry standard for toilet bowl stud holes, 1/2″ to 5/8″.

There is no evidence to support the plaintiff's assertion that the Bemis device, when preassembled, may be top-installable in some old bowls. Nor has the plaintiff offered evidence that in some old bowls the stud holes have diameters greater than 7/10″. Even assuming that the stud holes in certain bowls have diameters greater than 7/10″, there is no evidence that the defendant's dial-on hinge post could be securely fastened in these holes. The Watson hinge post itself would not work in holes with such large diameters. When Mr. Watson attempted to install his hinge

post in a hole with a diameter of 7/10″, the hinge post pulled out of the hole.

**B.   Bore and Counterbore**

The claims of the Watson patent describe a particular type of expansion fastener which incorporates a hollow stem defining a bore extending through it and a counterbore in the lower end portion of the stem communicating with the bore and adapted to receive a nut and retain it against rotation. A counterbore is simply an enlargement of the bore for the purpose, in this case, of allowing the insertion of a nut. The stem of the Watson device is designed to spread or flare.

The location of the bore in the claimed stem is such that a "multiplicity of elongated circumferentially-spaced slots" extend through the wall of the stem to the bore. Watson patent, claim 1. The slots allow the stem to expand as the nut is drawn up into the bore.

Contrary to the defendant's assertion, the record in this case establishes that the accused Bemis device has both a bore and a counterbore. These structures are clearly shown in drawings prepared by the defendant and introduced at trial (PX 137, DX 574) and by the uncontroverted testimony of Mr. Watson. The drawings show a bore at the top of the sleeve and a slight internal taper on each side of the sleeve which forms a counterbore. In addition, Mr. Watson testified that if the defendant's dial-on hinge post did not have a counterbore, the nut would not enter the bottom of the sleeve when the bolt is tightened because the nut would bear on the end of the sleeve. Thus, there must be some gap or space between the sleeve and the bolt so that the nut can pass between them.

**C.   Corresponding Polygonal Nut and Counterbore**

The Watson patent describes a nut and counterbore which are of "corresponding polygonal cross-section" in a "relative rotation-preventing relationship." Watson patent, claim 2. The polygonal counterbore

mates with the polygonal nut, gripping the nut to keep it from turning as the bolt is turned from above. The plaintiff contends that the nut and counterbore of the Bemis device are of corresponding polygonal cross-section which mate to prevent rotation of the nut. The defendant contends that these components are not polygonal within the meaning of the Watson patent.

The Watson patent describes the counterbore as having six flat sides which engage the corresponding six flat sides of the nut to prevent rotation of the nut when the bolt is turned. Col. 2, lines 52–58. The drawings in the Watson patent confirm this arrangement. The plaintiff asserts that "polygonal," as the term is used in the Watson patent, means only that the nut and counterbore must have multiple flat sides which meet for the purpose of preventing rotation of the nut when the bolt is turned. The plaintiff, however, can point to nothing in the patent in suit which so defines polygonal.

Having considered the patent as a whole and the circumstances surrounding its inception, I conclude that polygonal, as used in the Watson patent, refers to the fact that the flat sides of the nut engage the flat sides of the fingers which form the stem rather than the slots between the stems. In the accused Bemis device, however, the tabs on the conical bolt have flat sides which engage the flat edges of the slots between the two fingers of the stem, not the two fingers themselves. Whereas the Watson patent discloses a nut which is itself multisided, the Bemis nut is conical rather than multisided. It is only the two tabs protruding from opposite sides of the nut which are multisided, each having three sides.

The fact that the Bemis nut and stem mate in operation to prevent rotation does not establish that they are polygonal. To identify the nut and stem of the accused Bemis device as polygonal in cross-section stretches the meaning of polygonal beyond the limits of reasonableness and beyond the meaning disclosed by the Watson patent.

### D. No Literal Infringement

■ Although the plaintiff has been able to establish that the accused Bemis device has both a bore and a counterbore, it has failed to show that the accused device is top-installable or that its nut and counter bore are of polygonal cross-section within the meaning of the Watson patent. Accordingly, I conclude that there is no literal infringement of the Watson patent.

### II. Doctrine of Equivalents

■ The plaintiff next contends that the accused Bemis device infringes the Watson patent under the doctrine of equivalents. The doctrine of equivalents provides that infringement is established if it is shown that "two devices do the same work in substantially the same way, and accomplish substantially the same result, ... even though they differ in name, form, or shape." *Machine Co. v. Murphy*, 97 U.S. (7 Otto) 120, 125, 24 L.Ed. 935 (1878), *quoted with approval in Graver Mfg. Co., supra*, 339 U.S. at 608, 70 S.Ct. at 856. Failure to establish any one of the three elements of equivalence precludes a finding that an accused product is the equivalent of the claimed device. *See Nestier Corp. v. Menasha Corp-Lewisystems Div.*, 739 F.2d 1576, 1579 (Fed.Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985). Moreover, "an invention representing only a modest advance over the prior art is given a more restricted application of the doctrine [of equivalents]." *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1580 (Fed.Cir.1983). The *Graver* Court observed that in considering the issue of equivalence:

"[a]n important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was."

339 U.S. at 609, 70 S.Ct. at 856.

The parties do not dispute that the accused Bemis product and the claimed Watson device do the same work and accomplish the same result; namely, hingedly fixing toilet seats to toilet bowls. The par-

ties dispute lies in whether the two devices perform this function in substantially the same way. Having considered the evidence, I find that the two devices do not perform in substantially the same way.

The most significant difference between the two devices, discussed earlier in this decision, is that the Bemis dial-on hinge post is not top-installable within the meaning of the Watson patent. While the Watson patent claims a device that can be fully preassembled and inserted through the stud hole from above the toilet bowl, the Bemis device cannot be installed in this manner. Instead, the dial-on nut must be started on the bolt from beneath the stud hole. This difference in function alone is sufficient to defeat the plaintiff's claim of equivalence.

In addition, the tab and slot arrangement of the Bemis device performs in a substantially different way than the polygonal nut and counterbore arrangement claimed in the Watson patent. In both devices, the nut mates with the sleeve and is held against rotation. The Watson patent, however, describes a device in which the flat sides of the polygonal nut mate with the flat portions of the stem facing the bore. In the accused Bemis device, the flat sides of the tabs protruding from the conical nut mate with the side portions of the slots in the stem to prevent rotation of the nut. The two fingers of the Bemis stem are curved, not flat as in the Watson device.

The Bemis product in fact uses a tab and slot arrangement which Mr. Watson testified was well known to persons of ordinary skill in the art at least as early as 1967, well before the Watson patent was filed. R. 266. If the Watson claims are read so broadly as to cover the tab and slot arrangement of the Bemis device, they would read on the prior art. The claims, however, are to be given a range of equivalents only broad enough to distinguish them from the prior art and thus avoid invalidity. *Thomas & Betts, supra,* 720 F.2d at 1580.

My conclusion that the two devices are not equivalent is supported by the fact that the Watson patent is not a pioneer patent but represents only a modest advance over the prior art. Thus, it should receive a more restricted application of the doctrine of equivalents than a patent representing a more resounding advance over the prior art. *See id.*

I conclude that a person of ordinary skill in the art would not perceive the elements of the accused Bemis device as interchangeable with the claimed elements of the Watson patent. Accordingly, I find that the Watson patent is not infringed by the Bemis dial-on hinge post under the doctrine of equivalents.

### UNFAIR COMPETITION

The plaintiff has alleged that the defendant engaged in false and misleading advertising of its dial-on toilet seat with the accused hinge post in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a), and the common law of unfair competition.

In order to prevail on a claim of false or deceptive advertising under the Lanham Act, the plaintiff must prove by a preponderance of the evidence that: (1) the defendant has made false or deceptive statements of fact concerning its product, consisting of actual misstatements, partially correct statements, or a failure to disclose; (2) there is actual deception or a tendency to deceive a substantial portion of the advertising audience; (3) the deception is likely to influence purchasing decisions; (4) the advertised goods moved in interstate commerce; and (5) there is a likelihood of injury because of a decline in sales or a loss of good will. *Ragold, Inc. v. Ferraro U.S.A., Inc.,* 506 F.Supp. 117, 124 (N.D.Ill. 1980); *Skil Corp v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 783 (N.D.Ill.1974). To recover damages under section 43, the plaintiff must establish that the buying public was actually deceived; only a likelihood of deception must be shown to obtain equitable relief. *Hesmer Foods, Inc. v. Campbell Soup Co.,* 346 F.2d 356, 359 (7th Cir.), *cert. denied,* 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81 (1965).

The plaintiff's unfair competition claims are based on statements in certain Bemis advertisements which the plaintiff alleges falsely suggest that the defendant was the first to introduce seats with top-tightening hinges and the first to introduce seats with hinges that can be installed from above the bowl in seconds. The plaintiff also claims that the Bemis ads falsely state that toilet seats with these features could be obtained exclusively from Bemis. Finally, the plaintiff challenges statements made by Bemis in its advertising that the dial-on hinge was patented and that the defendant was the world's largest volume producer of toilet seats.

The court need not resolve the issue whether the Bemis advertisements complained of are false or deceptive. The unfair competition claims must be rejected in any case because the plaintiff offered no evidence that the ads actually deceive or tend to deceive a substantial segment of the advertising audience; that the alleged deception is likely to influence purchasing decisions; and that, as a result, the plaintiff is likely to suffer injury due to a decline in sales or loss of good will. *See Ragold, Inc., supra,* 506 F.Supp. at 124. The plaintiff merely concludes that the allegedly false advertising itself establishes the likelihood of consumer deception and injury. Such conclusory assertions, based solely on the content of the defendant's advertising, are insufficient to support the plaintiff's unfair competition claims. *See Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983). Therefore, the plaintiff's unfair competition claims must be rejected.

## ATTORNEY FEES

The defendant seeks its attorney fees in defending the patent infringement and unfair competition claims. The plaintiff also requests its attorney fees and treble damages in conjunction with its infringement and unfair competition claims. The plaintiff's request has been rendered moot by the court's rejection of the plaintiff's causes of action.

Under 35 U.S.C. § 285, "[t]he court in exceptional [patent infringement] cases may award reasonable attorney fees to the prevailing party." Section 1117, 15 U.S.C., contains an identical provision applicable to actions brought under § 43 of the Lanham Act. The defendant primarily bases its request for attorney fees on its claim that the plaintiff filed this suit without appropriate investigation.

Exceptional circumstances under § 285 include inequitable conduct during the prosecution of a patent, misconduct during litigation, fraud, and vexatious or frivolous litigation. *National Business Systems, supra,* 743 F.2d at 1239; *Bayer Aktiengesellschaft v. Duphar Research B.V.,* 738 F.2d 1237, 1242 (Fed.Cir.1984). Exceptional circumstances are interpreted in substantially the same way under § 1117. *See e.g., Vuitton et Fils, S.A. v. Crown Handbags,* 492 F.Supp. 1071, 1078–79 (S.D.N.Y.1979), *aff'd,* 622 F.2d 577 (2d Cir.1980). The party requesting attorney fees carries a heavy burden of proving exceptional circumstances by clear and convincing evidence. *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983).

The defendant in this case has failed to establish the existence of exceptional circumstances so as to entitle it to attorney fees under § 285 or § 1117. This case is not so one-sided that I can conclude that the plaintiff acted frivolously or in bad faith in bringing this action. I am satisfied that the plaintiff brought this action in good faith and after sufficient investigation. Accordingly, the defendant's request for attorney fees will be denied.

## CONCLUSION

For the foregoing reasons, the court concludes that the Watson patent is not invalid for obviousness and that the Watson patent is not infringed by the accused Bemis dial-on hinge post. The court further concludes that the plaintiff has failed to carry its burden on its claims of unfair competition.

Although the defendant Bemis did not succeed in having the plaintiff's patent de-

clared invalid or in its application for attorney fees, Bemis nevertheless prevailed in substantial aspects of the case—infringement and unfair competition. I find that Bemis is therefore entitled to costs; technically such costs should only relate to those aspects of the case on which Bemis prevailed. However, I believe that all aspects of the case are so interwoven as to make it unrealistic to attempt to segregate Bemis' costs. Therefore, Bemis will be entitled to all its costs in this action.

Therefore, IT IS ORDERED that the plaintiff is entitled to judgment that claims one and two of U.S. Patent No. 3,570,021 are valid under 35 U.S.C. § 103, without costs.

IT IS ALSO ORDERED that the defendant is entitled to judgment, with costs, that U.S. Patent No. 3,570,021 is not infringed by the defendant's dial-on hinge post.

IT IS FURTHER ORDERED that the defendant is entitled to judgment, with costs, as to the plaintiff's unfair competition claims under 15 U.S.C. § 1125(a) and at common law.

IT IS FURTHER ORDERED that the defendant's request for attorney fees be and hereby is denied.