CRITICARE SYSTEMS,
INCORPORATED,
Plaintiff,

v.

NELLCOR INCORPORATED, Defendant.

No. 91–C–1079.

United States District Court,
E.D. Wisconsin.

June 7, 1994.

James M. Shellow, Shellow, Shellow & Glynn, Jeffrey P. Clark, Alice D. Seeger, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, for Criticare Systems, Inc.

Michael E. Husmann, Charles P. Graupner, Michael, Best & Friedrich, Milwaukee, WI, for Nellcor Inc.

## ORDER

WARREN, District Judge.

Before the Court is the defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") in the above-captioned matter. For the following reasons, this motion is denied, and the parties shall appear at a pretrial conference before this Court on Tuesday, July 19, 1994 at 9:00 o'clock a.m. in Room 364 of the United States Courthouse, 517 E. Wisconsin Avenue, Milwaukee, Wisconsin, 53202.

## I. BACKGROUND FACTS

### A. FACTUAL BACKGROUND:

Plaintiff Criticare Systems, Inc. ("Criticare") is a Delaware Corporation with its principal place of business in Waukesha, Wisconsin. (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶ 1.) Defendant Nellcor Inc. ("Nellcor") is a Delaware Corporation with its principal place of business in Hayward, California. (Id. at ¶ 2.) The Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121(a) and pendent jurisdiction over state claims. (Id. at ¶ 3.) We have personal jurisdiction over Nellcor because it transacts business in Wisconsin, and proper venue pursuant to 28 U.S.C. § 1391. (Id. at ¶¶ 4, 5.)

Criticare and Nellcor are competing sellers in the market for pulse oximeters; Nellcor has a market share of approximately 50%, while Criticare's market share approaches 15%. (Id. at ¶ 6; Pl. Proposed Finding of Fact, Def. Resp. to Pl. Proposed Findings of Fact at ¶¶ 1, 2.) Pulse oximeters are used by anesthesiologists and other medical professionals to nonintrusively measure a patient's arterial blood oxygen saturation by shining light through the skin to detect the amount and quality of light emitted as the patient's pulse beats. (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶¶ 7, 11.) In order to ensure that there is enough blood at the receptor sight to obtain an accurate reading, a pulse oximeter measures oxygen saturation only on the pulse. (Id. at ¶ 12.)

Depending on the mode selected, Criticare's pulse oximeter presents either a pulse waveform, EKG waveform, or "trend data;" the pulse waveform demonstrates the existence and strength of the pulse that the sensor is detecting, while the EKG waveform apparently demonstrates the existence of a pulse only. (Pl. Proposed Findings of Fact, Def. Resp. to Pl. Proposed Findings of Fact at ¶ 11.) When used on pulse waveform, a bar graph on the monitor shows the existence and quality of the pulse, and the machine emits a pulse tone corresponding to the pace of the pulse and the level of blood

oxygen saturation; when on EKG waveform, the blip bar beats with the EKG. (*Id.*) As a patient's blood oxygen saturation falls, the pulse tone becomes lower and the pulse wave flattens. (*Id.* at ¶ 12.)

When a patient's pulse stops or becomes erratic, no pulse oximeter can detect his or her blood oxygen saturation level. (*Id.* at ¶ 9; Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶ 13.) In such circumstances, the Criticare pulse oximeter displays the last recorded saturation level for forty (40) seconds while it continues to search for a pulse; when on pulse waveform mode, it also displays a flat pulse wave, the bar graph disappears from the monitor, and the pulse tone ceases. (*Id.* at ¶ 12; Pl. Proposed Findings of Fact, Def. Resp. to Pl. Proposed Findings of Fact at ¶¶ 10, 14.) According to the defendant, if used on EKG waveform mode when the pulse is lost, the Criticare pulse oximeter will emit a pulse tone at the rate of the heart beat and at a level matching the last recorded saturation level. (*Id.* at ¶ 12.) If it fails to detect a pulse within forty (40) seconds, the Criticare pulse oximeter sounds an alarm. (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶ 10.)

Criticare markets its pulse oximeters at a price lower than that charged by Nellcor, due (at least in part) to the fact that Criticare heavily markets its reusable sensors, while Nellcor sells a higher proportion of disposable sensors. (*Id.* at ¶¶ 4, 5.) From 1990 to 1991, several major hospitals switched from Nellcor's product to Criticare's pulse oximeters and reusable sensors, including Long Beach Memorial Hospital in Long Beach, California, California Desert Samaritan Hospital in Phoenix, Arizona and the Medical College of Virginia Hospitals ("MCVH") in Richmond, Virginia; Criticare also entered into a preferred-vendor agreement with a group purchasing agent called American Health Care Systems. (*Id.* at ¶ 7.) Over that same period, Nellcor sold approximately $2,225,000 worth of disposable sensors to nearly one hundred (100) hospitals affiliated with Premier Hospitals Alliance, Inc. ("Premier"), a large group purchasing organization. (*Id.* at ¶ 6.)

The Child Health Corporation of America ("CHCA") is a not-for-profit corporation whose membership includes twenty-five (25) children's hospitals; it acts as a group purchasing organization in order to obtain better pricing for its members. (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶¶ 28, 29.) A separate corporate division of the CHCA is the Alliance of Children's Hospitals ("the Alliance"), which, *inter alia*, awards seals of approval to certain medical devices. (*Id.* at ¶¶ 30, 32.) It was for this purpose that the Alliance's pulse oximetry task force met in Kansas City, Missouri on August 28, 1991 to hear presentations from both Criticare and Nellcor regarding their respective products. (*Id.* at ¶ 34.)

At that meeting, Nellcor representatives displayed on an overhead projector a July 22, 1991 letter written to Curtiss G. Plaskon, the Director of Respiratory Care Services at MCVH, by Dr. Gary Lofland, the Director of Pediatric Cardiac Surgery and Medical Director of Cardiac Surgery, Intensive Care Unit, at MCVH, and an associate professor of both pediatrics and surgery at the Medical College of Virginia. (*Id.* at ¶¶ 8–10.) That letter read as follows:

"Dear Mr. Plaskon:

On the evening of July 16, 1991, we experienced another unfortunate episode involving the Criticare pulse oximeters. At that time, a 2 kg neonate who had successfully undergone an arterial switch procedure, closure of ventricular septal defect, closure of atrial septal defect, and ligation, division of patent ductus arteriosus experienced what can only be described as a pulmonary hypertensive crisis[1] which was not detected by the Criticare pulse oximetry system.

---

1. Nellcor defines a pulmonary hypertensive crisis as "a condition wherein the blood vessels into and in the lungs (pulmonary) suddenly constrict and prevent reoxygenation of the blood." (Def.

Proposed Findings of Fact at ¶ 21.) Criticare describes such condition as follows:
 "The right side of the heart supplies the left side of the heart with blood; the left side of the heart pumps blood to the rest of the body. In

The child in question was doing extremely well, and experienced a very sudden demise, with a 98% saturation frozen on the pulse oximeter screen. This represents the second episode involving the Criticare pulse oximeter system and neonates. If you recall, the earlier neonate had experienced a cardiac arrest, from which she was successfully resuscitated, with a high maturation again frozen on the screen. This episode was discussed at a Critical Care meeting, and it was decided at that meeting that the software for the Criticare systems would be changed, and that additional in-servicing of the nursing staff would be accomplished.

Neither of these two recommendations were accomplished. As a result, a patient who experienced a pulmonary hypertensive crisis, which is really the only plausible mechanism of death in these children, was not adequately treated because either the monitor failed to detect it or personnel using the system were not familiar enough with the data being displayed by the system to appropriately intercede. An appropriate intervention to an event such as this would have been bagging on 100% oxygen.

As a result of this episode, I can no longer afford to have infants and neonates undergoing complex cardiac surgical procedures be monitored by the Criticare system. Consequently, effective that date, all infants and neonates undergoing cardiac surgical procedures will be monitored with the Nellcor system, which is of proven efficacy in this group of patients. Under no circumstances will I proceed with surgery in a neonate or infant if the Criticare system is the only pulse oximetry system available for post operative monitoring.
Sincerely yours,
Gary K. Lofland, M.D.
Associate Professor of Surgery

and Pediatrics
Director of Pediatric Cardiac Surgery"

Dr. Lofland was not present when the infant referenced in his letter initially fell into pulmonary hypertensive crisis; however, he appeared seventeen (17) minutes later and participated in resuscitation efforts. (*Id.* at ¶ 15; Pl. Proposed Findings of Fact, Def.Resp. to Pl. Proposed Findings of Fact at ¶ 26.) Clearly, Dr. Lofland blames the Criticare pulse oximeter for this unfortunate occurrence. (*Id.* at ¶ 38.)

The parties vehemently dispute the circumstances surrounding the infant's death and the performance of the Criticare pulse oximeter. It is clear that, on July 16, 1991, Dr. Lofland performed a very risky heart surgery on a prematurely born infant—surgery even more difficult than a heart transplant. (*Id.* at ¶ 18.) In order to improve the odds of survival, the baby had to be completely anesthetized and paralyzed for several days during recovery. (*Id.*) Accordingly, Dr. Lofland or the anesthesiologist prescribed a potent anesthesia for the infant called Sufentanil. (*Id.* at ¶ 19.) At some point after the baby reached the intensive care unit, someone mistakenly administered a less potent anesthesia called Fentanyl, which wears off more quickly than Sufentanil. (*Id.*) At approximately 9:00 p.m., the baby's anesthesia was wearing off to the point where he was probably experiencing excruciating pain; however, while Nellcor argues that the baby may very well have been twitching, it is not likely that he could have cried or otherwise alerted his caregivers. (*Id.* at ¶ 20.) At this point, the baby's heart was maximally stressed and the stage was set for a crisis. (*Id.* at ¶ 21.)

Several monitors were attached to the baby when the above-referenced emergency began: a cardiac monitor, measuring heart

a pulmonary hypertensive crisis, the blood flow from the right side of the heart to the left side of the heart is impaired. When the left ventricle is not filled adequately, cardiac output to the rest of the body is reduced. With sufficient reduction, the blood pressure drops. Initially, this will not affect the oxygen saturation of the arterial blood. That is, the blood that is delivered through the lungs is fully oxygenated, but the supply or flow of the blood

is substantially reduced. As the blood pressure continues to drop, the heart itself is not receiving enough oxygen because the quantity of blood has been so substantially reduced. At this time, cardiac output will drop still further, the arterial blood oxygen saturation will begin to drop and the patient will go into cardiac arrest."
(Pl. Resp. to Def. Proposed Findings of Fact at ¶ 21.)

rate, temperature and respiration; a respirator; and a Criticare pulse oximeter. (*Id.* at ¶ 22.) At approximately 9:05 p.m., the attending nurse, Debbie Jacobs, glanced at the cardiac monitor when its blood pressure alarm went off and noticed that the baby's systolic blood pressure had suddenly plunged. (*Id.* at ¶ 23.) She attempted to counter the drop in pressure by administering albumin; she did not believe that she was treating a pulmonary hypertensive crisis. (*Id.*)

At that point, the pulse oximeter had an oxygen saturation reading of 98 percent; the parties dispute whether this figure represented an "accurate" reading. (*Id.*) According to Criticare, this initial reading was accurate because, at the outset, a drop in blood pressure "will not affect the oxygen saturation of the arterial blood." (Def. Proposed Findings of Fact, Pl.Resp. to Def. Proposed Findings of Fact at ¶ 21.) According to Nellcor, this reading could not have been accurate given that the pulse oximeter was unable to measure oxygen saturation when there was no blood pressure or pulse. (Pl. Proposed Findings of Fact, Def.Resp. to Pl. Proposed Findings of Fact at ¶ 23.) At any rate, the baby's heart rate then dropped; while Criticare indicates that Nurse Jacobs, when glancing at the pulse oximeter "one or two times," noticed that it "correctly indicated that the baby's blood oxygen saturation was declining," (*Id.* at ¶ 24), Nellcor claims that, according to Dr. Lofland (after discussing the incident with Nurse Jacobs), "the Criticare monitor, in accordance with its design, continued to display an old oxygen saturation value on the screen." (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶ 22.) Some time thereafter, Nurse Jacobs began handbagging the infant with 100% oxygen; according to Criticare, Nurse Jacobs acted immediately, while Nellcor claims that this occurred "relatively long after the crisis began." (*Id.* at ¶ 24; Pl. Proposed Findings of Fact, Def.Resp. to Pl. Proposed Findings of Fact at ¶ 24.) Criticare claims that Nurse Jacobs "did not base her decision to administer either albumin or oxygen on the pulse oximeter's readings ... [as] she knew that when the wave form and bar graph flattened, indicating a loss of

pulse, the instrument (like all other pulse oximeters) could not determine blood oxygen saturation." (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶ 23.) According to Nellcor, "the continued display of the old oxygen saturation value led the nurse to give the baby treatment for low blood pressure (albumen) rather than for low oxygen." (*Id.*) Finally, according to Criticare, "there is no absolute proof that the baby suffered a pulmonary hypertensive crisis ... [as] an autopsy was never performed"; Nellcor disputes this claim. (*Id.* at ¶ 21.)

On the morning of July 17, 1991, Kathy Marshall, a respiratory therapist at MCVH, learned of the prior evening's events and Dr. Lofland's outrage; she immediately sequestered the Criticare pulse oximeter at issue and brought it to the office of Mr. Plaskon. (Pl. Proposed Findings of Fact; Def.Resp. to Pl. Proposed Findings of Fact at ¶ 29.) Mr. Plaskon assembled a variety of health care professionals, including Dr. Kevin Cooper, the Medical Director for Respiratory Care Services at MCVH, to help him determine whether the pulse oximeter .was in any way responsible for the baby's death. (*Id.* at ¶ 30.) Ms. Marshall retrieved a trendline from the pulse oximeter's memory—data showing the baby's blood oxygen saturation level and pulse between 9:00 p.m. and 9:19 p.m. on July 16 when the crisis occurred; from this information, Mr. Plaskon created a chart comparing the patient's pulse, blood oxygen saturation level and physical condition at particular points in time. (*Id.* at ¶ 31.) Mr. Plaskon's chart apparently indicates that Criticare's pulse oximeter gave readings of the baby's blood oxygen saturation up until the baby's pulse was lost, forty seconds after which it set off an alarm; upon finding a pulse, the pulse oximeter displayed the baby's declining blood oxygen saturation. (*Id.* at ¶ 32.) The parties dispute the accuracy of these initial readings which, as Nellcor points out, affect the accuracy of the trendline; Nellcor also argues that some of the readings may have been detecting motion by the caregivers, rather than a pulse. (*Id.* at ¶¶ 31, 32.) At any rate, Dr. Lofland reported the incident to the Critical

Care Committee of MCVH. (*Id.* at ¶¶ 42, 43.)

As indicated in Dr. Lofland's letter, the Critical Care Committee, in response to a prior emergency involving another infant, had previously recommended to Criticare that it shorten the alarm delay on its pulse oximeter to twenty (20) seconds and provide training, or "in-servicing," to the nursing staff. (*Id.* at ¶¶ 18, 26.) Criticare provided such instruction to nurses and respiratory therapists both before and after the incident; according to Criticare, while Dr. Lofland did not attend such training, Nurse Jacobs was told and understood how the Criticare monitor worked. (*Id.* at ¶ 17; Pl. Proposed Findings of Fact, Def. Resp. to Pl. Proposed Findings of Fact at ¶ 25, 37.) Nellcor responds that there is no evidence as to the adequacy of such instruction, (Def. Proposed Findings of Fact, Pl.Resp. to Def. Proposed Findings of Fact at ¶ 17), or that Nurse Jacobs received it prior to the above-referenced incident (Pl. Proposed Findings of Fact, Def.Resp. to Pl. Proposed Findings of Fact at ¶ 25); it also references Dr. Lofland's deposition testimony that the wave forms of Criticare's pulse oximeter were "very difficult" to read, the Criticare vendor failed to instruct him as to the significance of the wave from, and he "knows exactly how a pulse oximeter is designed to work." (*Id.* at ¶¶ 14, 15.) In September of 1991, Criticare attempted to comply with the request of the MCVH to redesign its pulse oximeter by providing the MCVH with a number of monitor test chips with a reduced alarm delay. (Def. Proposed Findings of Fact, Pl.Resp. to Def. Proposed Findings of Fact at ¶ 27.) According to Criticare, a subgroup of the Critical Care Committee determined that there was nothing wrong with Criticare's pulse oximeters and that the monitors were not responsible for the incidents described by Dr. Lofland, and MCVH returned to the forty (40) second alarm time because a shorter time caused too many false alarms; Nellcor responds that no such findings were made. (*Id.* at ¶ 26; Pl. Proposed Findings of Fact, Def. Resp. to Pl. Proposed Findings of Fact at ¶ 33.)

Meanwhile, shortly after July 16, Dr. Lofland telephoned Rusty Coggins, a sales representative for Nellcor, and told him that he was about to write the above-cited letter. (*Id.* at ¶ 44.) On July 22, Mr. Coggins retrieved a copy of the letter from Dr. Lofland at MCVH; Dr. Lofland made clear his intention that the letter make its way to Dr. David Swedlow, a Nellcor Vice–President. (*Id.* at ¶ 45.) Mr. Coggins then faxed a copy of the letter to Keith Serzen and Patrick DeGrouchy, both Nellcor sales officials. (*Id.* at ¶ 46.) Nellcor officials, in turn, displayed the letter to representatives of the Alliance at the above-referenced August 28, 1991 presentation.

According to Criticare, a few weeks before this presentation, Dr. Swedlow met with Janet Roach, the Director of Capital Equipment of Premier, the group through which CHCA purchased medical equipment, and showed her Dr. Lofland's letter; Criticare indicates that Ms. Roach was also a member of the Alliance task force and the negotiator of a contract between Nellcor and Premier whereby Premier received one percent of all sales made by Nellcor to its affiliates (Premier received $250,000 in such fees between the third quarter of 1987 and the first quarter of 1991). (*Id.* at ¶¶ 50–51.) According to Criticare, this arrangement gave Premier an incentive to aid Nellcor in winning the Alliance contract. (*Id.*) Criticare also claims that (1) a few days before the August 28 meeting, Dr. Swedlow gave Ms. Roach a list of canned questions about Dr. Lofland's letter to ask Criticare during its presentation, and (2) the night before the meeting, Dr. Swedlow and other Nellcor representatives met once again with Ms. Roach to discuss revealing the letter at the meeting. (*Id.* at ¶ 51.) Nellcor claims that these allegations are not supported in any way by the record, (*Id.* at ¶¶ 50, 51); the parties do not dispute that Criticare made its presentation after Nellcor, and that Ms. Roach asked Criticare a number of questions. (*Id.* at ¶ 52; Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶ 40.)

Between September 9 and October 2, 1991, members of the Alliance pulse oximetry task force discussed the Nellcor and Criticare

presentations by telephone. (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶ 36.) On October 14, 1991, the task force voted 5–2 to recommend Nellcor's pulse oximeter. (*Id.* at ¶ 37.) On October 16, 1991, the Alliance council concurred with the task force's recommendation. (*Id.* at ¶ 38.)

According to Criticare, Dr. Roach acknowledges that the audience at the August 28 presentation was shocked by the charges alleged in Dr. Lofland's letter. (Pl. Proposed Findings of Fact, Def. Resp. to Pl. Proposed Findings of Fact at ¶ 53.) In response, Nellcor indicates that respiratory directors at several hospitals who attended the August 28 meeting and saw Dr. Lofland's letter, including John Servick of Children's Hospital in Columbus, Ohio, Sandra Wadlinger of Children's Hospital in Philadelphia, Mark Richardson of St. Louis Children's Hospital, and Sheryl Sladek of Children's Hospital of Wisconsin, as well as Edward Kuklenski, the vice president of shareholder services at CHCA, all claim that their hospitals did not base decisions to purchase Nellcor pulse oximeters on Dr. Lofland's letter. (Def. Proposed Findings of Fact, Pl. Resp. to Def. Proposed Findings of Fact at ¶¶ 42–51.) Criticare, however, claims that Nellcor continued to use Dr. Lofland's letter and allegations that Criticare's pulse oximeter caused the infant's death in a September 24, 1991 presentation to Paul Brown, a respiratory therapist at St. Joseph's Hospital in Flint, Michigan. (Pl. Proposed Findings of Fact, Def. Resp. to Pl. Proposed Findings of Fact at ¶ 57.) The parties agree that, since August of 1991, Criticare has been "virtually unable to convert hospitals that use only Nellcor equipment to switch to Criticare"; while Criticare claims that this is the result of Nellcor "brandishing Lofland's letter in public," Nellcor argues superior business acumen. (*Id.* at ¶ 59.)

### B. *PROCEDURAL BACKGROUND:*

Criticare filed its Complaint on October 4, 1991, alleging that Nellcor, by making false representations as to the performance of its pulse oximeter in presenting Dr. Lofland's letter to the Alliance, violated the Lanham Act, 15 U.S.C. § 1125, committed trade libel, and tortiously interfered with Criticare's prospective business relations; Criticare seeks, *inter alia,* injunctive relief (including an order prohibiting Nellcor from further exhibiting Dr. Lofland's letter), compensatory damages, punitive damages, exemplary damages, and costs and attorneys' fees. It also filed a Motion for a Preliminary Injunction to prevent Nellcor from making any subsequent false representations and/or showing Dr. Lofland's letter. On October 17, 1991, Criticare filed an Amended Complaint. Nellcor filed its Answer, Affirmative Defenses, and Counterclaim on October 31, 1991, denying any such liability and seeking injunctive relief, compensatory damages, and attorneys' fees for alleged violations by Criticare of the Lanham Act.

The Court signed a Stipulated Protective Order as to confidential information exchanged during discovery on November 13, 1991. On November 26, 1991, the Court signed a Stipulated Order precluding Nellcor from utilizing Dr. Lofland's letter, or the subject matter thereof, in any customer contacts "until completion of the trial." The Court was also required to resolve numerous discovery disputes throughout these proceedings. Nellcor filed the instant motion on March 19, 1993; Criticare responded on April 21, 1993, and Nellcor replied on May 10, 1993.

### II. *STANDARD OF REVIEW*

Rule 56(c) deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists only where a reasonable jury could make a finding in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). An issue of fact must also be material, as "only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. *See also Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992); *Local 1545, United Mine Workers of Am. v. Inland Steel Coal Co.,* 876 F.2d 1288, 1293 (7th Cir.1989). The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Anderson,* 477 U.S. at 254–55, 106 S.Ct. at 2513–14; *Santiago,* 894 F.2d at 221. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

 The moving party has the initial burden of demonstrating that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Local 1545,* 876 F.2d at 1292. Once this burden is met, the non-moving party must "go beyond the pleadings" and designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Local 1545,* 876 F.2d at 1293. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Koclanakis v. Merrimack Mut. Fire Ins. Co.,* 899 F.2d 673, 675 (7th Cir.1990), or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985), and both parties must produce proper documentary evidence

to support their contentions. *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990); *Local 1545,* 876 F.2d at 1293. In deciding a summary judgment motion, the Court must view the record in the light most favorable to the non-moving party, and all reasonable inferences shall be drawn in that party's favor. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Santiago,* 894 F.2d at 221. A court need not draw every inference from the record, only reasonable inferences. *Local 1545,* 876 F.2d at 1292–93; *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 886 (7th Cir.1989).

### III. DISCUSSION

#### A. LEGAL STANDARD:

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as applicable in this case,[2] provides as follows:

"**Civil action.** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, ser-

---

**2.** Subsection (a) of § 1125 was amended on October 27, 1992 to: redesignate paragraphs (1) and (2) as subparagraphs (A) and (B), respectively; redesignate the existing provisions of such subsection as paragraph (1); and add paragraph (2), which reads as follows:

"(2) As used in this subsection, the term 'any person' includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this Act in the same manner and to the same extent as any nongovernmental entity."

Pub.L. No. 102–542, § 3(c), 106 Stat. 3568. Congress, however, specified that such amendments "shall take effect with respect to violations that occur on or after [October 27, 1992,] the date of the enactment of this Act." Pub.L. No. 102–542, § 4, 106 Stat. 3568. While application of such amendments, mostly technical in nature, would not affect the outcome in this case, the Court shall nevertheless remain faithful to Congressional directive and apply the pre-amended version of § 1125(a), including the old paragraph designations.

vices, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

■ To prevail on such a claim, a plaintiff must prove that (1) the defendant made a false or deceptive statement of fact about its or another's products, consisting of actual misstatements, partially correct statements, or a failure to disclose; (2) such statement actually deceived or had the tendency to deceive a substantial segment of its audience; (3) the deception is likely to influence purchasing decisions; (4) the falsely advertised goods moved in interstate commerce; *and* (5) the plaintiff has been or is likely to be injured as a result, either by a direct diversion of its sales to defendant or by a lessening of its good will. *Grove Fresh Dist., Inc. v. New England Apple Prod. Co., Inc.,* 969 F.2d 552, 557 (7th Cir.1992); *Olsonite Corp. v. Bemis Mfg. Co.,* 610 F.Supp. 1011, 1025 (E.D.Wis. 1985) (Gordon, J.). "To recover damages under section 43, the plaintiff must establish that the buying public was actually deceived; only a likelihood of deception must be shown to obtain equitable relief." *Olsonite,* 610 F.Supp. at 1025 (citing *Hesmer Foods, Inc. v. Campbell Soup Co.,* 346 F.2d 356, 359 (7th Cir.), *cert. denied,* 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81 (1965)). *Accord Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990); *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 941 (7th Cir.1989), *cert. denied,* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). Summary judgment is appropriate if the plaintiff is unable to prove any one of these five elements. *See Olsonite,* 610 F.Supp. at 1026.

## B. *Parties' Arguments:*

Nellcor argues that Criticare cannot establish four of the five required elements for a Lanham Act claim. It first claims that, even if Criticare could show that Nellcor made a false statement about its pulse oximeter by presenting Dr. Lofland's letter, no injury resulted because (1) none of Criticare's customers were actually deceived, and (2) none of Criticare's purchasing decisions were actually affected. Secondly, it argues that nothing in Dr. Lofland's letter can be proven false because Criticare's pulse oximeter has "an admitted design problem [namely, its forty-second alarm delay and continued display of the last-recorded oxygen saturation level] that makes it dangerous for use on pediatric heart patients," and that Dr. Lofland's letter, at best, merely "implies" that the item failed to function properly. Nellcor next claims that, whether Dr. Lofland's letter is construed as criticizing the design or the functioning of Criticare's pulse oximeter, an opinion, as opposed to a statement of fact, "is not actionable under either § 43(A) of the Lanham Act or under the common law of libel." Finally, Nellcor indicates that, if it is granted summary judgment as to Criticare's Lanham Act claim, then the Court should dismiss the plaintiff's common law claims for lack of jurisdiction.

Criticare responds that this case is not appropriate for summary judgment because it "overflows with issues of material fact,"[3] Nellcor's intent in displaying Dr. Lofland's letter is at issue, and the "confusion and deception caused by Lofland's letter" is also at issue. It also argues that Nellcor has misstated the law governing its Lanham Act claims. For example, because "at least three of the statements in Lofland's letter are literally false and one is implicitly false," Criticare claims that it need not prove actual consumer deception. In addition, it argues that, because it has not abandoned its request for equitable relief (including an injunction precluding Nellcor from displaying Dr. Lofland's letter, an order that Nellcor publicly retract false statements made about Criticare's pulse oximeter, and an award of profits derived by Nellcor from such conduct), it need only establish a likelihood of, rather than actual, consumer deception. Cri-

---

**3.** According to Criticare, such facts include "(1) the cause of the baby's death described in Lofland's letter; (2) the appropriate treatment for the baby's crisis; (3) Lofland's ability to read and interpret data generated by Criticare's pulse oximeter; (4) the falseness of Lofland's accusa-

tions; (5) Nellcor's motive in displaying Lofland's letter; (6) the impression created by the letter; and (7) the impact the letter had upon purchasing decisions of the CHCA Task Force members and other prospective consumers."

ticare then highlights material issues of fact in this case, including the purported falsity of Dr. Lofland's letter, its actual and likely deception on the purchasing decisions of prospective customers, and the damages (if any) suffered by Criticare. Criticare also argues that "a false statement is factual and actionable [under the Lanham Act], regardless whether labeled fact or opinion, so long as it contains a provably false factual connotation and is not so obviously 'rhetorical hyperbole' that it 'cannot reasonably [be] interpreted as stating actual facts' about the disparaged entity." Finally, Criticare claims that, even if summary judgment is granted to Nellcor on Criticare's Lanham Act claim, judicial economy dictates that this Court retain pendant jurisdiction over its common law claims.

### C. ANALYSIS:

The Court shall examine each element required to prove a Lanham Act violation, viewing all reasonably-disputed facts in a light most favorable to the plaintiff. If no reasonable jury could find for the plaintiff on any such element, then summary judgment for the defendant is proper.

### 1. *False statement of fact:*

■ To prevail under the Lanham Act, Criticare must first show that Nellcor made a false or deceptive statement of fact about Criticare's pulse oximeter, consisting of actual misstatements, partially correct statements, or a failure to disclose. Criticare argues that the following portions of Dr. Lofland's letter constitute false or deceptive statements regarding its pulse oximeter:

"[A child] who had successfully undergone [surgery] experienced what can only be described as a pulmonary hypertensive crisis which was not detected by the Criticare pulse oximetry system.

The child ... was doing extremely well and experienced a very sudden demise, with a 98% saturation frozen on the pulse oximeter screen.

[The child] who had experienced a pulmonary hypertensive crisis ... was not adequately treated because either the monitor failed to detect it or personnel using the system were not familiar enough with the data being displayed by the system to appropriately intercede.

An appropriate intervention to an event such as this would have been bagging on 100% oxygen."

According to Criticare, the first three sentences are literal falsehoods, while the fourth is implicitly false.

Viewing the disputed facts in the light most favorable to the non-movant, the Court is satisfied that Criticare could convince a reasonable jury that these statements constituted literal and/or implicit falsehoods regarding its product. Regarding the first statement, given the acknowledgement by Criticare's own expert, Dr. William H. Perloff, that "the most likely explanation for the crisis which occurred on July 16, 1991, was an episode of acute severe pulmonary hypertension," Criticare would be hard-pressed to convince a jury that Dr. Lofland misstated the cause of death in his letter; nevertheless, a reasonable jury may believe that Dr. Lofland patently misstated that the Criticare pulse oximeter failed to detect such condition. As an initial matter, Dr. Lofland was not present when the crisis began; therefore, he has no first-hand knowledge of whether the instrument detected the symptoms of a pulmonary hypertensive crisis. According to Dr. Perloff, a patient suffering a pulmonary hypertensive crisis first exhibits a loss of blood pressure; at least initially, no decline in blood oxygen saturation occurs.[4] Therefore, a 98% saturation level reading at the outset of the crisis may, indeed, have been accurate, and remained so for some brief period of time thereafter. Furthermore, because no pulse oximeter can detect blood oxygen saturation when, as in this case, a patient's pulse stops or becomes erratic, it may very well be that no such instrument could (at least for a brief period of time) "detect" such a crisis; in such circumstances, Dr. Lofland's statement would clearly be misleading as to the source of blame. Moreover, the deposition testimony of Nurse Jacobs indicates that, contrary to Dr. Lofland's assertion, Criticare's pulse oximeter did, in

---

4. *See supra* note 1.

fact, read declining blood oxygen saturation levels as the crisis continued. Finally, Nurse Jacobs and others trained in use of Criticare's product apparently knew that, while the instrument holds the last-recorded saturation value on the screen for forty (40) seconds before sounding an alarm, changes in its wave form, bar graph, and pulse tone during that interim all warn that blood oxygen saturation is declining. Based on such facts, a reasonable fact finder could conclude that Criticare's pulse oximeter did, in fact, function properly in response to the infant's condition.

A reasonable jury may also determine that the second above-cited sentence of Dr. Lofland's letter is patently false in light of Nurse Jacobs' testimony and that of Dr. Lofland himself. Again, Dr. Lofland was not present when the crisis began, apparently arriving some seventeen (17) minutes later. Furthermore, his deposition testimony indicates that, after arriving at the scene, he had no idea of the numbers being displayed by Criticare's pulse oximeter. Nurse Jacobs, on the other hand, recalled that the instrument indicated declining blood oxygen saturation levels—a conclusion supported by the trendline recovered from the pulse oximeter by Ms. Marshall. While a 98% saturation level may have been held on the screen for some time after the infant's blood pressure dropped, reasonable factfinders may conclude that such a reading did not remain "frozen" on the pulse oximeter screen throughout the crisis as stated in Dr. Lofland's letter.

Based on facts presented by Criticare, the third above-cited sentence of Dr. Lofland's letter may also be found to be a false or deceptive statement. We previously held that a reasonable jury could conclude that the Criticare pulse oximeter functioned properly in response to the crisis, thereby rebutting any inference that inadequate treatment received by the infant resulted from equipment failure. Such a jury may also conclude that persons using the Criticare equipment, including Nurse Jacobs, were, in fact, "familiar enough with the data being displayed to appropriately intercede." Nurse Jacobs' deposition testimony indicates that she was familiar with the wave form and bar graph located on the screen near the blood oxygen saturation number which should be consulted to verify that the number is accurate.* While Nurse Jacobs did not realize that she was treating a pulmonary hypertensive crisis, she does not indicate that she was misled by the instrument. In addition, according to Criticare, Dr. Lofland, on whose testimony Nellcor relies regarding proper functioning of Criticare's pulse oximeter, never attended any product training sessions. Again, a reasonable jury viewing such evidence could conclude that the statement in Dr. Lofland's letter attributing inadequate treatment to faulty functioning or training was patently false.

Moreover, we conclude that a reasonable factfinder could deem the fourth above-cited sentence of Dr. Lofland's letter implicitly false and/or misleading. As argued by Criticare, Nurse Jacobs did, in fact, hand-bag on 100% oxygen as the crisis progressed. While Nellcor maintains that Dr. Lofland meant to say that Nurse Jacobs should have immediately bagged on 100% oxygen, rather than administering albumin first, he did not state this in his letter. Moreover, the interim between such treatments is not clear, and a reasonable factfinder could determine that the brief delay in administering oxygen was not responsible for the infant's death.

■ Finally, we are not convinced that any of the statements in Dr. Lofland's letter are constitutionally-protected statements of opinion. As an initial matter, Criticare properly notes that commercial speech, including promotional activity, warrants less First Amendment protection than other forms of expression, and that false or misleading commercial speech is accorded no constitutional protection at all. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563–66, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341 (1980). In addition, Nellcor's attempt to distinguish between statements of fact and statements of opinion was rejected by the Supreme Court in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which recognized that freedom of expression "is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy be-

tween 'opinion' and 'fact'." *Id.* at 19, 110 S.Ct. at 2706. In *Milkovich,* the Supreme Court recognized that a false statement is factual and actionable, regardless whether labeled fact or opinion, as long as it contains a provably false factual connotation and is not so obviously "rhetorical hyperbole" that it "cannot 'reasonably [be] interpreted as stating actual facts'" about the disparaged entity. *Id.* at 20, 110 S.Ct. at 2706 (citation omitted). The allegations contained in Dr. Lofland's letter clearly do not constitute "rhetorical hyperbole"; regardless of Dr. Lofland's intent, they are presented as affirmative statements by a knowledgeable professional regarding the circumstances surrounding the infant's death. We therefore hold that a reasonable jury could find that Nellcor, through Dr. Lofland's letter, made literal and impliedly false statements about Criticare's pulse oximeter, not protected under the First Amendment, thus satisfying the first element of a Lanham Act claim.

### 2. *Deception of audience:*

The second element of a Lanham Act claim is that the false statement actually deceived or had the tendency to deceive a substantial segment of its audience. In this case, Criticare (despite Nellcor's contrary representations) continues to seek equitable relief; it need only show a likelihood of, rather than actual, consumer deception to recover on such claims. *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990); *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 941 (7th Cir.1989), *cert. denied* 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). Moreover, in determining whether a plaintiff must show actual deception or simply a tendency to deceive, the Seventh Circuit recognizes "a difference between false literal statements and misleading or impliedly false statements under § 43(a)—a court may find on its own that a statement is literally false, but, absent a literal falsehood, may find that a statement is impliedly false only if presented with evidence of actual consumer deception." *Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 14 (7th Cir.1992) (applying rule to request for injunctive relief). *See also McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1548–49 (2d Cir.1991) (applying rule to request for injunctive relief); *PPX Enter., Inc. v. Audiofidelity Enter., Inc.* 818 F.2d 266, 272–73 (2d Cir.1987) (applying rule to request for compensatory damages). In the previous section, we held that a reasonable factfinder could conclude that statements in Dr. Lofland's letter were literally false. Therefore, "to prevail on the merits ... [Criticare] need not present evidence of actual [consumer] confusion," and need only show that Dr. Lofland's letter had a tendency to deceive a substantial segment of its audience to recover on equitable claims. *Abbott,* 971 F.2d at 14.

A reasonable jury in this case could conclude that false statements made in Dr. Lofland's letter actually deceived *and* were likely to deceive its audience. Deposition testimony by Ms. Roach, who Criticare claims to be one of "Nellcor's co-conspirators," indicates that the audience at the August 28 meeting, upon seeing Dr. Lofland's letter, was "shocked" that use of the Criticare pulse oximeter could lead to the death of small children. This response, in turn, apparently caused audience members to press Criticare to explain Dr. Lofland's allegations during the remainder of the conference and afterwards. In addition, Mr. Brown's deposition testimony indicates that he had a favorable opinion of Criticare's pulse oximeters, and was considering purchasing them for his hospital, until a Nellcor sales representative told him of Dr. Lofland's allegations. Nellcor offers strong deposition testimony from several participants at the August 28 presentation to counter these claims; however, we are satisfied that a reasonable jury, after finding that Dr. Lofland's letter contained false statements of fact, could weigh this evidence in favor of Criticare by determining that sophisticated consumers sensitive to medical malpractice claims were actually, and therefore likely to be, deceived.

### 3. *Influence on purchasing decisions:*

The third element which Criticare must prove to prevail under the Lanham Act is that Nellcor's deception was likely to influence purchasing decisions. Criticare again offers the evidence presented in the preced-

ing section as well as the fact that, while several major hospitals switched from Nellcor's product to Criticare's pulse oximeters and reusable sensors between 1990 and 1991, it has been "virtually unable to convert hospitals that use only Nellcor equipment to switch to Criticare" since the August 28, 1990 presentation. Nellcor responds with its evidence from the preceding section and argues that its superior business acumen has prevented Criticare from attracting any of its customers since August of 1991. Admittedly, the evidence thus far presented by Criticare is weak on this point; however, viewing it in the light most favorable to Criticare, the Court believes that a reasonable jury could nevertheless find that false statements made in Dr. Lofland's letter influenced the purchasing decisions of potential Criticare customers. Therefore, Nellcor is not entitled to summary judgment based on this element.

#### 4. *Goods in interstate commerce:*

██ Fourthly, Criticare must show that the falsely advertised goods moved in interstate commerce. The facts make clear, and Nellcor does not dispute, that Criticare's pulse oximeters moved in the interstate market; therefore, Criticare has adequately established this element of its Lanham Act claim.

#### 5. *Injury to the plaintiff:*

██ The final element which Criticare must show to establish a Lanham Act violation is that it was or is likely to be injured, either by a direct diversion of its sales to Nellcor or by a lessening of its good will. For the reasons discussed in the preceding sections, we are satisfied that a reasonable jury could conclude that, as a result of Nellcor's display of Dr. Lofland's letter at the August 28 presentation and use of it thereafter, Criticare lost business to Nellcor and suffered depletion of its good will in the market for pulse oximeters.

██ In recompense for such injuries, Criticare seeks, *inter alia*, compensatory dam-

ages, equitable relief, exemplary damages, and costs and attorneys' fees. The parties agree that in the Seventh Circuit, a plaintiff need only prove a likelihood of consumer deception to be entitled to equitable relief under the Lanham Act. *Web Printing*, 906 F.2d at 1205; *Roulo*, 886 F.2d at 941. However, they dispute whether the Second Circuit decision in *PPX*, which allows a plaintiff to recover compensatory damages under the Lanham Act by proving a likelihood of, rather than actual, consumer deception, has been adopted by the Seventh Circuit. While Criticare correctly indicates that *PPX* was cited favorably by the Seventh Circuit in *Abbott*, the plaintiff in the latter case sought equitable relief; therefore, the Court is not convinced that the Seventh Circuit adopted the rule sought by Criticare. *See id.*, 971 F.2d at 14.[5]

We believe that the Seventh Circuit rule regarding the proof of consumer deception in seeking Lanham Act remedies remains as stated in *Web Printing*, which provides as follows:

"It seems to us that the district court confused a Lanham Act violation with a Lanham Act remedy. It confused the elements necessary to prove a breach of the law with elements necessary to justify a certain remedy for that breach. It mixed two stages of inquiry—violation of the law; remedies for the violation—that should be kept separate.

The inquiries should be kept separate because a violation of the Lanham Act can be remedied in more ways than one. The usual way, and the way which in this case riveted the court's attention, is by an award of damages. *A plaintiff wishing to recover damages for a violation of the Lanham Act must prove the defendant's Lanham Act violation, that the violation caused actual confusion among consumers of the plaintiff's product, and, as a result, that the plaintiff suffered actual injury, i.e., a loss of sales, profits, or present value (goodwill).* WPC [the plaintiff] did not

---

**5.** By citing *PPX*, the Seventh Circuit in *Abbott* simply affirmed that, if a plaintiff shows that statements made by the defendant were literally, rather than impliedly, false, it need not show

actual consumer deception to establish a Lanham Act violation; it said nothing about proving damages thereunder. *See id.*, 971 F.2d at 14.

prove the elements essential to a recovery of damages, of course, so to it that avenue of relief is foreclosed. *Other avenues of relief, however, are not foreclosed. In the past, courts have fashioned wide-ranging relief for a violation of the Lanham Act, allowing remedies such as a recovery of defendant's profits, an award of costs of the action, and, in some exceptional circumstances, an award of attorney's fees. These remedies flow not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or, in the case of costs, merely from its proof of the defendant's Lanham Act violation. To collapse the two inquiries of violation and remedy into one which asks only of the plaintiff's injury, as did the district court, is to read out of the Lanham Act the remedies that do not rely on proof of 'injury caused by actual confusion.' And this, of course, is improper."*

*Id.,* 906 F.2d at 1204–05 (footnote and citations omitted) (emphasis added). Because Criticare may reasonably establish that Dr. Lofland's letter contains false statements of fact, it is only required to prove a likelihood of, rather than actual, consumer deception to establish a Lanham Act violation for purposes of this motion. This, in turn, would constitute an adequate basis for recovery under equitable and other non-compensatory remedies. To recover compensatory damages, however, Criticare would be required to show actual consumer deception. As previously indicated, the Court is satisfied that a reasonable jury could find such deception. Therefore, we must deny Nellcor's request for summary judgment, and find that all of the remedies sought by Criticare remain viable.

## IV. *SUMMARY*

For the foregoing reasons, it is hereby **ORDERED** that the defendant's Motion for Summary Judgment pursuant to Rule 56 be **DENIED** in the above-captioned matter, and that the parties appear at a pretrial conference before this Court on *Tuesday, July 19, 1994 at 9:00 a.m.* in Room 364 of the United States Courthouse, 517 E. Wisconsin Avenue, Milwaukee, Wisconsin, 53202.

**SO ORDERED.**